LISA GOLDSMITH, Petitioner, v NEW YORK PSYCHOANALYTIC INSTITUTE et al., Respondents.

First Department, February 21, 1980

### APPEARANCES OF COUNSEL

*Morris Pottish* for petitioner.

*Morris B. Abram* of counsel *(Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for New York Psychoanalytic Institute and another, respondents.

*Adele Graham* of counsel *(Ann Thacher Anderson,* attorney), for State Division of Human Rights, respondent.

### OPINION OF THE COURT

LUPIANO, J.

Petitioner holds a Ph.D. in psychology and is an assistant professor at the Albert Einstein Institute of Medicine. She applied for admission to the New York Psychoanalytic Institute, an educational association which has an advanced research student program. This program was designed to train psychoanalysts, usually holding the M.D. degree, including highly qualified lay analysts. Petitioner's application to the institute was supported by eminent and renowned psychiatrists, some of whom are members of the institute. The approval of three committees of the institute was necessary for admission. Two of the committees in passing upon petitioner's background and qualifications, including the fact that she suffered Hodgkin's disease, found her to be highly qualified and gave her excellent evaluations. Hodgkin's disease at one time was a fatal illness in all instances. However, medical science is now advanced to the point where the disease may be combatted and its sufferers subject to remission. Despite the unanimous approval of the 6-member Research Students Committee and of the 14-member Admissions Committee, the Educational Committee determined to disapprove petitioner's application, apparently because she suffered from Hodgkin's disease. This, despite the fact that she had undergone treatment for the disease and was in full remission since April, 1974. Petitioner was given no explanation for her rejection. Further, the institute as a policy allowed reapplications two

years after submission of the first application. Petitioner so applied after a two-year wait but was informed that her application could not be considered "at this time." Again, no explanation was given. At this point, petitioner, on February 16, 1978, filed a complaint with the State Division of Human Rights, which launched its own investigation. As a consequence of this investigation, which encountered less than full co-operation by the institute, it was concluded that there was probable cause to believe that the institute had engaged, or was engaging in, an unlawful discriminatory practice. The matter was referred to public hearing.

Prior to the first hearing scheduled for February 27, 1979, complainant served a subpoena duces tecum for the production of the respondent institute's records. A motion to quash the subpoena was brought by the institute in the Supreme Court, New York County, in which it argued that confidentiality and privilege attached to the subpoenaed records. Special Term denied the motion to quash and granted petitioner's cross motion to enforce the subpoena. In its decision, Special Term noted that the questions of privilege and confidentiality were for the Administrative Law Judge and judicial review could be obtained in a CPLR article 78 proceeding after exhaustion of administrative review. The Administrative Law Judge sustained complainant's subpoena upon the institute's attack on it in the administrative proceeding. Undaunted, the institute made an extraordinary motion to the Commissioner of Human Rights for an interlocutory ruling, seeking to overrule the Administrative Law Judge. The motion was denied by the commissioner and the institute thereupon sought a stay from the State Human Rights Appeal Board, which was denied.

Parenthetically, in order to gain delay of the hearing to permit the tactics engaged in by the institute; it consented on March 21, 1978 "to waive at any time in this proceeding and in any review thereof or in any other administrative or court proceeding, the claim that the State Division of Human Rights has failed to process the complaint in a timely manner."

Ten of the institute's officers and representatives who had been subpoenaed by the petitioner complainant defaulted in appearing.[1] At the hearing session of June 6, 1979, the insti-

---

1. Of the 10, 2 did initially appear but subsequently refused to appear at subsequent adjourned dates of the hearing.

tute itself deliberately defaulted in appearing and has never moved to open its default. At said hearing, complainant moved on notice to the institute to strike the institute's answer on the ground that the latter had willfully violated the orders of the Supreme Court and the Administrative Law Judge with respect to the production of relevant and material evidence. The motion was granted and the matter proceeded, in effect, as an inquest.

Section 297 (subd 4, par b) of the Executive Law provides that "[i]f the respondent fails to answer the complaint, the hearing examiner designated to conduct the hearing may enter the default and the hearing shall proceed on the evidence in support of the complaint. Such default may be set aside only for good cause shown upon equitable terms and conditions." Respondent institute never attempted to set aside its default.

The lengthy and detailed final order issued by the Commissioner of the State Division of Human Rights after the hearing before Administrative Law Judge AMOS CARNEGIE sets forth, *inter alia,* the following: "26. The Educational Committee * * * had voted to reject Complainant's application * * * (c) crucial concerns of said Committee as expressed in the minutes of the meeting in which the rejection vote was taken were: 1) Would the requirement for future chemotherapy interfere with the mental functions that are necessary for analysis. 2) The general responsibility of placing a patient in analysis with a candidate who had a chronic and potentially fatal illness. 27. The Educational Committee rejected Dr. Eisendorfer's suggestion that Complainant's 'current analyst' be contacted 'to assess her current status' [and] also rejected any contact with Complainant's personal physician. 29 * * * [T]he Educational Committee's decision to reject Complainant's application was based upon conjecture and supposition. Said Committee ignored Complainant's superb qualifications and, in its own words, 'her many talents, her prior work on measurement of ego functions, and her promise as a candidate.' Also, the Committee disregarded the recommendation of Drs. McDevitt, Blumenthal and Sternschein, who interviewed Complainant and recommended her acceptance. The unanimous recommendation of the Research Committee and the Admissions Committee were likewise ignored by the Educational Committee. 30 * * * [T]he rejection of Complainant's application by the Educational Committee was due solely to

her disability [and] in violation of the Human Rights Law * * * 48. I find that Complainant's illness, Hodgkin's disease, is a disability within the meaning of the Human Rights Law."

On subsequent application by the division to Special Term for a mandatory injunction directing the respondent institute to accept petitioner into its Research Students Program, that court determined it did not have the power to so direct because the commissioner had issued a final order and consequently such power resided in the Appellate Division.[2] On further administrative appeal by the institute to the State Human Rights Appeal Board, the latter, without reaching the merits, determined "that the Division [had] unreasonably exceeded the amended statutory time limit of 465 days from the filing date of the instant complaint to the date of the final Decision and Order after Public Hearing from which the instant appeal was taken * * * in violation of the provided time frame imposed by Section 297 (4) (a), (c) of the Human Rights Law as amended on August 5, 1977." Accordingly, the Appeal Board annulled the division's order and dismissed the complaint.

The record herein is devoid of any claim by the respondent institute of excessive delay (which claim would ring hollow in view of its stipulations waiving delay) or of a showing of substantial prejudice. We have already stated that "[t]he extended time limits provided by the recent amendments of section 297 (L 1977, ch 729, §§ 1, 2) are directory, not mandatory *(State Div. of Human Rights v Pennwalt Corp., Pharm. Div.,* 66 AD2d 1006), and 'absent a showing of substantial prejudice or such egregious delay as will constitute prejudice as a matter of law, "delay attributable solely to the administrative agency should not operate to foreclose relief to an innocent complainant who is not responsible for it." ' *(State Div. of Human Rights v Pennwalt Corp., Pharm. Div., supra,* at p 1007, citing *Tessy Plastics Corp. v State Div. of Human Rights,* 62 AD2d 36, 40, affd 47 NY2d 789)" *(Matter of Callaghan v State Div. of Human Rights,* 72 AD2d 679).

Here, there is no claim or evidence of actual prejudice to the institute as a result of delay and there is no claim of undue delay caused by petitioner. Consequently, the State Human Rights Appeal Board erred in not reaching the merits

---

2. Special Term (SHAPIRO, J.) noted: "However, were there the power to grant such relief the court would do so in the circumstances of this case" *(Matter of Kramarsky v New York Psychoanalytic Inst.,* 102 Misc 2d 806).

and in its view that the statutory time limits are mandatory under all circumstances, regardless of the equities or the public policy underlying the Human Rights Law. The parameters of the Appeal Board's narrowed scope of review are set forth in subdivision 7 of section 297 of the Executive Law. Under that section, the review is limited to the power of a court reviewing an administrative determination made after hearing. The board is not empowered to find new facts or take a different view of weight of evidence if the commissioner's determination is supported by substantial evidence *(State Div. of Human Rights v Columbia Univ. in City of N. Y.,* 39 NY2d 612, cert den *sub nom. Gilinsky v Columbia Univ.,* 429 US 1096). It may not substitute its judgment for that of the State Division of Human Rights *(Matter of Winthrop Labs. Div. of Sterling Drug v New York State Human Rights Appeal Bd.,* 64 AD2d 725).

Patently, the record herein is sufficiently detailed to afford a reasonable basis for adminsitrative determination, despite the subsequent default by the institute at the hearing. The investigation by the State division may be termed abbreviated only in the sense that the institute willfully defaulted during the course of the hearings, having been dissatisfied with the rulings it had theretofore sought from the Administrative Law Judge and the court. If the evidence (which is quite substantial and detailed) is one-sided, that fact is attributable solely to the institute.

Regarding the adequacy of the record herein, it is noted that the transcript of the hearing before the Administrative Law Judge comprises 460 pages and that two witnesses testified at that hearing, to wit, Dr. Whitney, the executive secretary of the New York Psychoanalytic Institute, and the complainant, Dr. Lisa Goldsmith. Dr. Whitney's testimony embraces some 187 pages of the transcript while the complainant's testimony embraces 86 pages. Perusal of this testimony discloses that it is quite detailed. Apart from the testimony, numerous exhibits were admitted into evidence. These include, *inter alia,* the 1976-1976 catalogue of the institute; the institute Research Student Program, 1966-1975, prepared by Dr. Jay Shorr; the recommendations regarding guidelines to be used by institutes in making application for waiver of minimal standards for full psychoanalytic training, prepared by the Committee on Research and Special Training of the Board on Professional Standards—the American Psychoana-

lytic Association; the complainant's application for admission to the Research Students Program of the New York Psychoanalytic Institute, dated October 2, 1975; letters of recommendation by, *inter alia,* Dr. Stein, Director of Residency Training at the Albert Einstein College of Medicine of Yeshiva University, Dr. Mann, associate clinical professor at the said college and Professor Pine of said college; a five-page report of Dr. Mc-Devitt regarding his interview with the applicant for the Research Students Committee;[3] summary of the minutes of the Research Students Committee, February 18, 1976, wherein the committee unanimously voted to accept the complainant;[4] six-page (favorable) report of the interview on behalf of the Admissions Committee conducted by Dr. Blumenthal, dated March 21, 1976;[5] five-page (favorable) report of the interview on behalf of the Admissions Committee conducted by Dr. Sternschein; minutes of the meetings of the Admissions Committee on June 8, 1976 and June 22, 1976 disclosing, *inter alia,* reflective consideration of the fact that Dr. Goldsmith, the applicant, had Hodgkin's disease which was "stabilized" and Dr. Sternschein's report of his inquiry concerning the status of treatment of the disease from which "[h]e was able to say that based on the type, etc. of Dr. G's disease, her outlook was very good;"[6] and the minutes of the meeting of the Educational Committee held on October 5, 1976, which culminated in a rejection of Dr. Goldsmith's application by a vote of 14 for rejection, 1 abstention, without offer of any modified program.[7]

---

3. In this favorable report, acknowledging the applicant's superior intellectual capacity, it is admitted that the only "hitch" is the existence of Hodgkin's disease. Assuming the applicant was rejected for this reason, the report states: "I think an *honest* explanation would have to be given to her" (emphasis supplied). Concern about complainant's psychological state did not, it appears, extend to realization of this objective, i.e., the furnishing to her of the reason for rejection of her application.

4. These minutes disclose, *inter alia,* a declaration by Dr. Pine that Dr. Goldsmith "has one of the best minds they have had up there" (at Einstein) and Dr. Spence's statement that in reviewing her thesis he "believes that it is the most impressive of all he has seen here."

5. It is aptly noted in this report that "if we accept the *objective* judgments about [complainant's] outlook for long term survival or cure, then * * * her anxiety about her illness would be analyzable sufficiently to enable her to do analytic work * * * I do not think [relevant to a recurrence] we can ask for that degree of certainty in life, therefore I would accept her" (emphasis supplied).

6. The minutes note that complainant's "impressive talents and the interest in her research led to a 'ground swell' in the committee * * * the vote to accept her was unanimous."

7. These minutes are illuminating. Despite the "ground swell" in support of her

The expansive nature of the factual background disclosing the rationale behind the institute's rejection of Dr. Goldsmith's application is necessitated, not only by the spurious contention that the record is inadequate, but by the procedural nuances disclosed in that record and the unique circumstances surrounding the applicant—her apparently extraordinary intellectual ability and promise and experience with Hodgkin's disease. Parenthetically, reflection upon an applicant's application to an educational body such as the institute of necessity calls for a delicate interplay of objective and subjective factors in the exercise of judgment upon whether to accept or reject the application. The court is loath to trespass upon the exercise of that judgment. However, where, as here, in the context of judicial review of an administrative determination involving violation of the Human Rights Law, it is claimed and shown, without countervailing demonstration on the record, that objective criteria were, in effect, discounted and subjective factors predominated to an unjustifiable extent, and where the rationale underlying that rejection, to wit, the applicant's experience with Hodgkin's disease, has been found to be in the given context a disability within the meaning of the Human Rights Law and where that determination is supported by substantial evidence, elucidation of the record and acknowledgment of the propriety of the administrative determination based on that record is proper.

Disingenuously, the respondent institute and respondent chairman of its Educational Committee through counsel assert that they have "not yet been permitted to present their defense" and that complainant is guilty of endeavoring to "short-cut or short-circuit statutory procedures." It suffices to

application, two members, relevant to her experience with Hodgkin's disease, reflecting upon *their* relationship with patients who had similar "fatal" disorders, opined that classical analysis most likely would not be possible. Apart from the parameters of consideration which would as a matter of common sense disclose that Dr. Goldsmith is a unique individual, and apart from the nebulous overtones of the concept "fatal" in light of the advances of modern science and Dr. Goldsmith's continuing remission which augered well for the future, the subjective, as compared to objective norms operating in this reflection upon Dr. Goldsmith's candidacy, was further highlighted by a suggestion from another member that the psychological aspect of Dr. Goldsmith's endeavoring to apply emanated from "magical thinking" (on her part) and a "denial of illness." Although there was expressed a "humanistic concern and the wish to train this talented young woman," an endeavor to compromise by rendering training to her in some modified form was rejected. Accordingly, the suggestion advanced that "the usual procedure" be followed "with respect to this woman" was adopted.

reiterate that respondents were given the opportunity to defend, but chose during the course of that defense to default and abandon the arena of the administrative hearing to complainant after somewhat unusual motion practice of their own, which choice they have not endeavored to undo by seeking to vacate their default.

Relevant to the issue of the subpoenas served by complainant and respondent, the following is noted: Complainant's subpoena, dated January 24, 1979 and served January 29, 1979, directed to the respondent New York Psychoanalytic Institute, requested, in effect, all their records relating to consideration and disposition of complainant's application. Subsequently, it appears, said respondents issued a subpoena for all hospital records relating to the complainant for an eight-year period commencing 1971 through 1978. Complainant refused to waive her physician-patient privilege respecting these records, contending that respondents were engaged in a fishing expedition in the hope of trying to find out something that might be helpful to them. Respondents' motion directed to Special Term to quash certain items of the complainant's subpoena claiming the physician-patient privilege and, alternatively, for a declaration that complainant has waived the physician-patient privileges for all matters for purposes of the State Division of Human Rights proceeding was unsuccessful. The court granted the complainant's cross motion for an order compelling the respondents' compliance with her subpoena to the extent of directing the respondents to produce the documents demanded in accordance with the rules of the division, acknowledging that in affirmatively calling for these documents, complainant (for whose protection the privilege exists) has waived her privilege with respect thereto. Respondents claim that this limited waiver constituted a waiver of the physician-patient privilege by complainant with respect to any and all other medical records of the complainant was rejected as "not supported by any argument in respondents' papers."

The Administrative Law Judge to whose discretion in the matter Special Term correctly bowed, ruled that the privilege was waived by complainant respecting the records of the institute, but refused to enforce the respondents' subpoena, in effect, adopting complainant's contention that the subpoena was too broad and constituted a fishing expedition without a sufficient showing of materiality. Dissatisfied with this ruling, the respondents chose to leave the hearing. That the adversar-

ial aspect of the hearing may have been undermined by respondents' action is solely attributable to the respondents' tactics. The hearing was not thereby vitiated or the hearing process frustrated, but proceeded in accordance with applicable rules and mandates of law.

What is at issue is whether the determination of the State Division of Human Rights is supported by substantial evidence on the whole record and is not arbitrary, capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Necessarily subsumed within that issue is whether the record is adequate. If the record is inadequate, it follows that there is insufficient substantial evidence as an inadequate record cannot permit a reasoned conclusion finding substantial evidence to support the administrative determination. As above indicated, the record herein clearly and unequivocally demonstrates substantial evidence in support of the order of the State Division of Human Rights.

In the answer[8] of respondent institute and respondent chairman of the educational committee of the institute, there are submitted posthearing affidavits of Drs. Root and Solomon which are dehors the record, by which device said respondents seek to advance the defense they opted not to advance at the hearing by their default and failure to vacate that default. Accordingly, we do not consider these affidavits.

What is troublesome to the conscience of the court is the overtone of a general proposition that legal, ethical and moral rectitude ascribed by the institute to its actions herein serves in some fashion to shield it from the normal administrative and judicial processes concerned with alleged human rights violations because of the institute's nature. No such privileged position has been accorded, as far as we can ascertain, to any field of science or educational discipline and we perceive no basis for according such distinction to the field of psychology and psychiatry. After all, psychology and psychiatry are disciplines in the service of man, along with a host of other disciplines, and do not of themselves eclipse man or identify with him to the exclusion of all other considerations. Complainant in endeavoring to vindicate her rights under the rule of law may take satisfaction in the realization that she has served to recall this salutary truth.

---

8. (Answer to petition in this original proceeding commenced pursuant to Executive Law, § 298, as contrasted with the answer to the complaint in the administrative proceeding.)

Petitioner complainant's argument, supported by respondent State Division of Human Rights that respondent institute has no standing to have administrative review in consequence of its default and the striking of its answer at the hearing because it is not a party aggrieved thereby (see CPLR 5511), is without merit in view of the statutory directive embodied in the Human Rights Law empowering the State Human Rights Appeal Board to hear appeals "by *any party* to any proceeding before the division" (Executive Law, § 297-a, subd 6, par c; emphasis supplied). The term "any party" is not qualified by the term "aggrieved" as is the case for subsequent judicial review and enforcement (Executive Law, § 298). The respondent institute did not cease to lose its status as a party by virtue of its default at the hearing, albeit it is not a party aggrieved. Respondent institute through its counsel admits that, prior to its deliberate default and the striking of its answer, it had "answered the complaint and actively contested complainant's claim through 21 months of litigation and two sessions of the public hearing," acknowledging "the thick volumes of court papers and correspondence which have accumulated in this case." Respondent institute declares that it is motivated by "the highest ethical considerations." In light of the profession with its dedication to the healing art to which the institute and its members owe allegiance, we assume the truthfulness of averments by the institute that actions taken by it regarding complainant were motivated by the highest ethical and moral considerations. Nevertheless, on this record, it is clear that the rejection of complainant's application constituted a violation of complainant's right to "an equal opportunity to enjoy a full and productive life" (Executive Law, § 290). Complainant having vindicated this right, it is in the spirit of those averments and in the name of that healing art to which the members of the institute, as well as complainant subscribe, that assurance arises for the well-being of the relationship between the institute and complainant engendered by this vindication, unimpeded by this exercise of the police power of the State.

To reiterate, we assume the truthfulness of the ethical and moral principles attributed by the institute to its motives in its relationship with Dr. Goldsmith, but this does not mandate ignorance of the abiding inclination of human nature to self-justification.

Parenthetically, it is recalled at this point for purposes of some emphasis that Dr. Sternschein consulted a specialist in the field of Hodgkin's disease specifically in regard to the petitioner complainant's particular condition and reported to the institute the result of that inquiry, to wit, a favorable prognosis. This, of itself, in the context of this detailed record vitiated in large measure, if not totally, the gravamen of the institute's position in rejecting complainant. As remarked by Dr. Blumenthal, life itself is uncertain—"I do not think we can ask for that degree of certainty in life." Judgment has not been rushed herein, but the time has certainly come to ensure its swiftness.

Mindful of the strong public policy underlying the Human Rights Law and of the prejudice petitioner complainant has already suffered in her academic pursuit by having her admission to the institute delayed since her original application in October, 1975, and cognizant of the strength of the evidentiary showing underlying the commissioner's order contained in this record, we have determined to examine the contentions of petitioner and to confirm the findings of the New York State Division of Human Rights, doing that which the New York State Human Rights Appeal Board should have done (see *Matter of Callaghan v State Div. of Human Rights,* 72 AD2d 679, *supra).* This step avoids needless circuity of action under the circumstances herein and recollects that justice delayed may well be justice denied.

The order of the State Human Rights Appeal Board, dated October 22, 1979, should be annulled, on the law, and the order of the State Division of Human Rights, dated September 24, 1979, should be confirmed, on the merits, without costs and disbursements.

MURPHY, P. J., and MARKEWICH, J., concur; BIRNS, J., concurs in result only.

Order of the State Human Rights Appeal Board, dated October 22, 1979, annulled, on the law, and the order of the State Division of Human Rights, dated September 24, 1979, confirmed, on the merits, without costs and without disbursements.